1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAROLD J. STENSON,

                Petitioner,

    v.

JOHN LAMBERT,

          Respondent.

No. C01-252P

ORDER DENYING PETITIONER'S
PETITION FOR WRIT OF HABEAS
CORPUS, GRANTING
RESPONDENT'S MOTION TO
STRIKE, DENYING PETITIONER'S
MOTION TO EXPAND THE
RECORD, DENYING PETITIONER'S
MOTION RE EVIDENTIARY
HEARING, AND GRANTING
PETITIONER'S MOTION TO TAKE
JUDICIAL NOTICE

      This matter comes before the Court on Petitioner Darold J. Stenson's ("Stenson") Petition for

Writ Habeas Corpus under 28 U.S.C. § 2254 arising from his state court conviction and sentence of

death for two counts of premeditated first degree murder with aggravating circumstances.  (Dkt. No.

68).  Also pending are Respondent's ("the State") Motion to Strike contained in its Answer, (Dkt. No.

79), Stenson's Motion to Expand the Record, (Dkt. No. 87), Stenson's Motion re Need for

Evidentiary Hearing and to Deem Alleged Facts Admitted, (Dkt. No. 134), and Stenson's Motion to

Take Judicial Notice, (Dkt. No. 135).  The Court has reviewed all the pleadings and the state court

record, and has heard oral argument by the parties.  For the reasons set forth below, the Court hereby

DENIES Stenson's Petition for Writ Habeas Corpus, GRANTS the State's motion, DENIES

Stenson's motions to expand the record and regarding an evidentiary hearing, and GRANTS Stenson's motion to take judicial notice.

BACKGROUND

In 1994 Stenson was convicted and sentenced to death for two counts of premeditated first degree murder with aggravating circumstances.  He was convicted of shooting and killing his wife Denise Stenson and his business partner Frank Hoerner.  Stenson filed a direct appeal in the Washington Supreme Court, which affirmed the judgment and the sentence.  Washington v. Stenson, 132 Wn.2d 668, 940 P.2d 1239 (1997), *cert. denied* 523 U.S. 1008 (1998) (hereinafter "Stenson Direct Appeal").

In his first Personal Restraint Petition ("PRP"), he argued, among other things, a variety of Sixth Amendment ineffective assistance of counsel claims.  The Washington Supreme Court denied the PRP.  In the matter of the Pers. Restraint of Stenson, 142 Wn.2d 710, 16 P.3d 1 (2001) (hereinafter "Stenson I").

He then filed the instant habeas corpus petition asserting thirteen grounds for relief, which he labeled by letter as follows:

    A:   Violation of right to self-representation

    B:   Violation of right to counsel due to conflict of interest on the part of his counsel

    C:   Violation of right to counsel due to irreconcilable conflict between himself and his counsel

    D:   Violation of right to counsel due to lack of representation at a critical stage in the proceedings

    E:   Violation of right against self-incrimination at sentencing

    F:   Violation of right to effective assistance of counsel at sentencing

    G:   Violation of right to present mitigating evidence at sentencing

H:   Violation of right to effective assistance of counsel at trial by failing to pursue an alternate

suspect theory, introduce other exculpatory evidence, and discover impeachment evidence

concerning state criminalist Mike Grubb

I:   Constitutionally inadequate proportionality review

J:   Violation of right to effective assistance of counsel on appeal[1]

K:   Violation of right to allocution at sentencing

L:   Violation of right to have jury unanimously find all aggravating factors beyond a

reasonable doubt

M:  Violation of right to disclosure of exculpatory evidence

(Dkt. No. 68).  Stenson and the State agreed that Stenson had exhausted eight of these claims in state court, which are claims A-G and a part of H.  Stenson conceded that he had not exhausted claims K, L, M, and the part of H concerning state criminalist Mike Grubbs.  Stenson and the State disagreed about whether Stenson had exhausted claim I.

After filing the habeas petition in this Court, Stenson filed a second PRP in which he raised all of the claims that were unexhausted in his habeas petition.  (This Court stayed the habeas petition while his second PRP was pending.)  The Washington Supreme Court dismissed the Second PRP on the ground that it was a mixed petition because it contained both time-barred claims and claims that potentially fell under the time-bar exceptions.  In re Pers. Restraint of Stenson, 150 Wn.2d 207, 76 P.3d 241 (2003) (hereinafter "Stenson II").

Stenson then filed a third PRP in which he raised claims relating to the proportionality review of his sentence.  The Washington Supreme Court dismissed the Third PRP on the ground that it was

---

[1] This claim is identified as a distinct claim in a list of claims that Stenson attached to his habeas petition, but he did not treat it as a separate claim in his memorandum in support of his habeas petition.  (Dkt. No. 69).  Rather, he includes it as one of five sub-claims under his proportionality claim (claim I).  Hereinafter, the Court will treat it as part of claim I rather than as a distinct claim.

1  procedurally barred by the abuse of the writ doctrine.  In re Pers. Restraint of Stenson, 153 Wn.2d

2  137, 102 P.3d 151 (2004) (hereinafter "Stenson III").

3       In light of these Washington Supreme Court rulings, Stenson now voluntarily withdraws claims

4  K, L, M, and the portion of H concerning Mike Grubbs.  (Dkt. No. 149).  Stenson contends that claim

5  I is not procedurally defaulted because the Supreme Court's ruling in Stenson III procedurally barring

6  this claim was not based on an independent and adequate state ground.

7  I.  Guilt Phase of the Trial

8       On July 12, 1994, after 21 days of jury selection for Stenson's trial, Stenson requested

9  appointment of substitute counsel or in the alternative to represent himself.  The court held a hearing

10  on the request, during which Stenson signed a motion, drafted by his current counsel, making this

11  same request and citing Faretta v. California, 422 U.S. 806 (1975), for the pro se request.  (REC

12  4641-48[2]; Pet., Attach. G[3], 590-92).  During the hearing, Stenson's lead counsel Fred Leatherman

13  ("Leatherman") indicated that he, his co-counsel David Neupert ("Neupert"), and Stenson disagreed

14  about how to proceed with the defense of the case, which was the genesis of Stenson's motion.

15       The court held an in camera hearing later that day.  The judge found that the motion was not

16  timely as required under state law.  (REC 4654).  Further, he noted that state law required that any

17  request to proceed pro se must be unequivocal.  He stated "[t]hat's not the case here where we are

18  being asked to appoint counsel or in the alternative to allow someone to act pro se.  So I find that

19  that's not really requested and I will not nor will I consider a motion to allow Mr. Stenson at this time

20  to act pro se on his behalf."  (Id.)  The judge then discussed the request for new counsel and

21  concluded that Stenson's current counsel was not providing ineffective assistance of counsel and

22

23       [2] References to the state court record are referred to as "REC" followed by the bate stamped
page numbers.

24       [3] At oral argument, both parties agreed that the documents in Attachment G are documents
that the trial court sealed but that are part of the state court record.  Therefore, this Court includes the
25  documents in Attachment G as part of the record in this case.

1    therefore new counsel was not warranted.  Returning to Stenson's request to represent himself, the

2    judge stated that Stenson "makes it clear that he wants to be represented by counsel, not by himself.

3    His statements make that clear.  So I think that's not an issue, his pro se representation.  I essentially

4    ruled that out of my considerations in this matter."  (REC 4660).  The judge characterized his own

5    comments as "musings" and asked Stenson if he wanted to address them and explain the reasons for

6    his motion in camera and ex parte (which he did the next day).

7        During a lengthy in camera, ex parte hearing held the next day, July 13, the judge, Stenson, and

8    Leatherman discussed the disagreements between Stenson and Leatherman and Stenson's request for

9    appointment of new counsel.  At the outset, Stenson agreed to allow Leatherman to outline the

10   disagreement between them.  (REC 4773).  Leatherman stated that it was his and his co-counsel

11   Neupert's opinion, as well as that of the two defense investigators, that the guilt phase was not "win-

12   able" and therefore "we do not want to do anything during the course of the guilt phase which in our

13   professional judgment would create problems or prejudice Mr. Stenson's defense in the penalty

14   phase."  (Id.)  Leatherman stated that he and Stenson had different ideas about how to proceed

15   "tactically in the guilt phase" because he was focused on the penalty phase and trying to avoid a death

16   penalty, whereas Stenson was focused on being acquitted in the guilt phase.  (REC 4773-74).

17       Stenson spoke next, complaining about the lack of communication with his counsel, their

18   alleged failure to investigate certain things which would prove that someone else committed the

19   murders, and their alleged demand that he agree to proceed in a certain way at trial.  He stated that

20   they were not going to fight for him.  (REC 4776-78, 4788-90).  Leatherman responded by noting that

21   the defense's blood spatter expert reached essentially the same conclusion as the state's expert, which

22   Leatherman believed made the guilt phase not win-able.

23       Leatherman acknowledged that he and Stenson had different objectives.  (REC 4786).  He then

24   elaborated that Stenson wanted to introduce evidence that would cast the blame for the murders on

25   Denise Hoerner (the wife of the victim Frank Hoerner).  Leatherman stated that he did not believe this

would be possible under the current state of Washington law.  (REC 4786-88).  He clarified, however, that:

> I never stated to Mr. Stenson and it is my opinion to just lie down and quit and not do anything, not cross examine witnesses, just [sic] the State's evidence roll over him and bury him in the guilt phase.  I'm not saying that.  We do plan to cross examine witnesses as effectively as we possibly can and pointing out whatever inconsistencies might exist in their testimony and if expert witnesses express opinions that we think go beyond what the evidence supports, we will bring that out.  So we are going to mount a defense.  We are not talking about quitting here.  But what we are talking about is whether we are going to be a party to a strategy that puts another person on trial and tries to lay this crime at their feet because we don't think that this is a proper strategy because of potential legal problems with that approach.

(REC 4792).  Stenson did not raise his request to represent himself during this July 13 hearing.

After this lengthy discussion between Leatherman and Stenson, the trial judge stated that it appeared to him that the "essential dispute in this case is as to whether or not Mrs. Hoerner is cross examined in a fashion that would tend to make her look like a suspect in this case.  Is that essentially the strategy that's the concern here?"  (REC 4803).  The record indicates that Stenson nodded his head in response and Leatherman verbally agreed.  The judge delayed ruling until the next day.  (REC 4805).

The next day, July 14, the judge held another hearing on Stenson's request.  The judge opened the hearing by restating his denial of Stenson's request to represent himself on the grounds that the request was not timely and not unequivocal.  (REC 4959-60).  The judge also denied the request for new counsel.  He observed that nothing in the case showed that counsel had failed to act diligently or in any way other than in Stenson's best interest, and in fact counsel had argued numerous pre-trial motions and participated in extensive jury selection.  (REC 4963-64).  In discussing the reasons for the request, the judge found that "the reasons in this instance relate solely to an issue of trial strategy" noting that Stenson wanted to place another person on trial for the crime, which was rarely allowed under state law.  (REC 4966-67).

In response Stenson stated that "I would formally make a motion then that I be able to allow [sic] to represent myself. I do not want to do this but the court and the counsel that I currently have force me to do this." (REC 4969). The judge responded that Stenson had a constitutional right to represent himself if the request is timely and found that Stenson's request was not and further stated that "I also find based upon your indications that you really do not want to proceed without counsel." (REC 4970). Stenson replied "But likewise I do not proceed [sic] with counsel that I have." (Id.). The judge stated he understood but that he was going to deny the motion to proceed pro se. (Id.).

The jury was sworn on July 14, 1994. On July 18, Stenson submitted a letter to the judge requesting appointment of new counsel. (Attach. G, 506-14). He reasserted his dissatisfaction with Leatherman. He did not renew his request to represent himself in this letter. The judge denied the request.

On August 3, after trial had started, Leatherman moved to withdraw when he learned of a local newspaper article in which Stenson's family criticized defense counsel's strategy. (Attach. G, 435). Leatherman assumed that Stenson had also spoken to the press. The court held an ex parte hearing that day in which Leatherman stated that he had advised Stenson not to speak with the press and that:

> I'm very concerned about the nature of the attorney-client relationship. Right now I don't feel like I have an attorney-client relationship with Mr. Stenson. I'm extremely frustrated with him to the point of really not wanting to go on with this case. Put a lot of work and effort into this case on his behalf. And to read something like this at this point just, it's disgusting. Quite frankly, I can't stand the sight of him. . . . If the court orders me to continue, your Honor, I will. . . . the nature of my relationship with Mr. Stenson has been getting worse and worse and worse. To the point now where I don't think we are even communicating. I'm certainly not communicating with him and he's not communicating with me and we are heading in different directions on this case.

(REC 6625-26). Stenson agreed that communication had been "nonexistent" but admitted that counsel's performance during trial had been exceptional. (REC 6629-30). He claimed that his attorneys had not visited enough with him since the trial started and that he did not even know who they were going to call as witnesses.

1    The judge denied the motion to withdraw.  He opined that the jurors would not see the article

2    since the judge had repeatedly admonished them not to read the press and that the article would not

3    undermine Stenson's case.  He concluded that Stenson was receiving competent and professional

4    counsel and there was no reason to allow counsel to withdraw.  (REC 6626-29, 6630-31).  He stated

5    that Stenson could make a motion to substitute counsel or to proceed pro se if the situation continued.

6    (REC 6629).  Stenson did not do so for the rest of the trial.

7    II.  Penalty Phase of the Trial

8    During opening arguments of the penalty phase, Leatherman told the jury "I also want you to

9    understand that speaking on behalf of the defense we accept your verdict without reservation

10    whatsoever.  We don't question it.  We understand that your verdict is supported by the evidence

11    overwhelmingly so."  (REC 7213).

12    Among other testimony, Leatherman called the father of Stenson's dead wife, Mr. Philip

13    Oberman, to the stand.  Leatherman asked Mr. Oberman if he believed that Stenson had killed Mr.

14    Oberman's daughter and if so, when he came to have this belief.  Mr. Oberman answered that he

15    believed that Stenson had killed his daughter and that he came to this belief before the trial when

16    Leatherman had shown Mr. Oberman photos of the blood stains on Stenson's pants.  (REC 7423-24).

17    Leatherman also called Dr. Muriel Lezak to offer expert testimony regarding Stenson's mental

18    capacity.  Dr. Lezak testified that Stenson was of high average intelligence but that he had a deficiency

19    in his capacity to plan and organize.  (REC 7321-22).

20    During closing argument, Leatherman referred to Dr. Lezak's testimony and said that Stenson

21    did not fake the test results and that:

22        . . . There's something wrong with his brain.
    Think back to the facts of this crime and you'll know that's true. . . .

23        But look at this crime and how unbelievably stupid it was.  To shoot two
people in your own house and then claim you didn't hear any shots.  To shoot your

24    wife and shoot your business associate, then try to make it look like he shot her and
committed suicide.  When they had no relationship.  To hit a man over the head and

25    leave injuries that would have had to have been discovered.

ORDER - 8

> Mr. Stenson is not a stupid man. He's above average intelligence. And the planning or the effort that he visualized to do this is very poor. He was a man in a very bad financial situation. He was very greedy. His solution was terrible. His carrying out of his plan was terrible.
>
> If you just look at the facts of the crime itself on its surface, on its face, it tells you that his mind does not work properly. He is not safe to be among us. That's why locking him up for the rest of his life in a situation where choices are made for him is going to protect society because he's not going to be among us and that should be one of your goals. Protect each of us. It's going to punish him. He deserves to be punished for this crime. It is a fair result.

(REC 7454-55).

Both Leatherman and Neupert stated in depositions taken after the trial that Stenson had not authorized them to admit his guilt during the penalty phase. (REC 10629, 10709).

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standard for granting federal habeas relief on a claim that was adjudicated on the merits in state court. Habeas relief shall not be granted unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established Federal law, as determined by the Supreme Court of the United States" refers to the Supreme Court's holdings, not dicta, at the time of the relevant state-court decisions. Williams v. Taylor, 529 U.S. 362, 412 (2000). Even though the lower courts cannot establish a "constitutional principle," they still have "independent interpretive authority with respect to applying Supreme Court doctrine." Robinson v. Ignacio, 360 F.3d 1044, 1056 (9th Cir. 2004) (internal quotes omitted, citing Williams, 529 U.S. at 382). Thus, when the lower courts confront a novel factual situation, they may identify and apply general governing principles from Supreme Court decisions. Id. at 1056-57.

ORDER - 9

1    The "contrary to" and the "unreasonable application of" clauses have independent meaning.

2    Williams, 529 U.S. 404-05.  A state court ruling is "contrary to" clearly established federal law if the

3    state court either reaches an opposite conclusion on a question of law than the Supreme Court reached

4    or decides a case differently than the Supreme Court "on a set of materially indistinguishable facts."

5    Id. at 412-13.  A state court ruling is an "unreasonable application of" clearly established federal law

6    "if the state court identifies the correct governing principle from [the Supreme Court's] decisions but

7    unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  An unreasonable

8    application of federal law is not the same as an incorrect application of federal law.  It requires that the

9    state court decision be more than incorrect.  Even if the federal habeas court concludes in its

10   independent judgment that the state court incorrectly applied the federal law, habeas relief is not

11   warranted unless the application is also objectively unreasonable.  Id. at 410-12.  "The gloss of clear

12   error fails to give proper deference to state courts by conflating error (even clear error) with

13   unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

14   I.  Claim A: Violation of Right to Self-Representation

15        Under the Sixth Amendment, a defendant has a constitutional right to represent himself so long

16   as he chooses to do so knowingly and intelligently.  Faretta v. California, 422 U.S. 806 (1975).  The

17   improper denial of a valid request to proceed pro se is a per se prejudicial error and requires automatic

18   reversal of a criminal conviction.  United States v. Arlt, 41 F.3d 516, 524 (9th Cir. 1994).  To be valid,

19   however, the defendant's request must be both unequivocal and timely, not for purposes of delay.

20   United States v. Erskine, 355 F.3d 1161, 1167 (9th Cir. 2004) (citing Arlt, 41 F.3d at 519).  Contrary

21   to Stenson's argument in his reply that the equivocal nature of the request is a question of law for

22   which less deference to the trial court's finding is due, at least three circuits treat the equivocal nature

23   of the request as a question of fact.  United States v. Kienenberger, 13 F.3d 1354, 1356 (9th Cir.

24   1994) (implying that this is a question of fact); United States v. Mackovich, 209 F.3d 1227, 1237 (8th

25   Cir. 2000) (citing Hamilton v. Groose, 28 F.3d 859, 862 (8th Cir. 1994)) (clearly stating that this is a

1   question of fact); Fields v. Murray, 49 F.3d 1024, 1032 (4th Cir. 1995) (same).  As such, the state

2   court's finding is reviewed under § 2254(e)(1)'s presumption of correctness, which Stenson has the

3   burden of rebutting by clear and convincing evidence.

4          Stenson raised this claim in his direct appeal.  The Washington Supreme Court upheld the trial

5   court's ruling on the grounds that the request was not unequivocal.  Stenson Direct Appeal, 132

6   Wn.2d at 738.  The Supreme Court acknowledged the constitutional right to proceed pro se

7   established in Faretta, but noted that the request to proceed pro se must be both timely and stated

8   unequivocally.  Id. at 737.  The Supreme Court cited the Ninth Circuit's decision in Adams v. Carroll,

9   875 F.2d 1441, 1445 (9th Cir. 1989), for the principle that a request is not deemed equivocal merely

10  because it is made as an alternative to appointment of new counsel.  Stenson Direct Appeal, 135

11  Wn.2d at 740.  However, the Supreme Court held that such a conditional request "may be an

12  indication to the trial court, in light of the whole record, that the request [is] not unequivocal."  Id. at

13  740-41.  Citing the same facts from the record cited above, the Supreme Court concurred with the

14  trial court's conclusion that the request was equivocal.  The Supreme Court noted that:

15          almost all of the conversation between the trial judge and the Defendant concerned his
            wish for different counsel.  He repeatedly discussed which new counsel should be
16          assigned.  He explained he had contacted a number of attorneys and had asked for
            permission to talk with his newly-selected counsel.  He told the trial court he did not
17          want to represent himself but that the court and his counsel had forced him to do that.
            More importantly, the Defendant did not refute the trial court's final conclusion that
18          he 'really [did] not want to proceed without counsel.' [Citation omitted.]  After the
            trial judge denied the request for substitution of new counsel and the request to
19          proceed pro se, the Defendant, pursuant to a request from the trial court to put his
            request in writing, filed a written request which sought appointment of new lead
20          counsel, retention of the existing second counsel, appointment of [lead counsel] for the
            penalty phase, and a continuance.  In that request, the Defendant did not mention
21          proceeding pro se.  While the Defendant's request was conditional, it was also
            equivocal based on the record as a whole.
22
    Id. at 742.
23
24         The relevant factors in determining whether a request is equivocal are the timing of the request,

25  the manner in which it is made, and whether the defendant repeatedly makes the request.  Requests

ORDER - 11

1  that are emotional outbursts, in response for example to the judge's denial of the defendant's request

2  for new counsel, have been deemed equivocal.  Jackson v. Ylst, 921 F.2d 882 (9th Cir. 1990).  In

3  contrast, requests have been deemed unequivocal in instances where the defendant repeatedly

4  requested appointment of new counsel or in the alternative to represent himself, but the request was

5  not was "a momentary caprice or the result of thinking out loud."  Adams, 875 F.2d at 1442-43; see

6  United States v. Hernandez, 203 F.3d 614 (9th Cir. 2000), United States v. Arlt, 41 F.3d 516 (9th Cir.

7  1994).  A defendant's failure to renew his request after the judge denied it does not necessarily show

8  equivocation if the failure to renew the request was a reasonable response to the judge's "firm denial."

9  Hernandez, 203 F.3d at 622-23.  Nonetheless, as the court in Hernandez acknowledged, there may be

10  some instances in which the failure to renew a request supports the conclusion that the request was

11  equivocal.  Id.; see Jackson, 921 F.2d at 888-89.

12      Here, given the presumption of correctness that § 2254(e) requires a federal habeas court

13  afford to the state court's factual findings, habeas relief is not warranted on this claim.  Stenson has

14  not shown that the Washington Supreme Court's ruling was contrary to or an unreasonable

15  application of clearly established federal law.  It is correct that neither the conditionality of Stenson's

16  request nor his failure to renew the request after the judge denied it is itself evidence of equivocation.

17  There is no indication in the record that it was an emotional outburst made in response to the judge's

18  denial of his request for new counsel.  Stenson made his request to represent himself in his initial

19  motion before he knew how the judge would rule on his request for new counsel.  These particular

20  facts support the conclusion that this case is more like Adams and Hernandez than like Jackson, which

21  would lead to the conclusion that Stenson's request was unequivocal.  However, other facts (cited by

22  the Washington Supreme Court) indicate that it was not unreasonable to conclude that Stenson's

23  request was equivocal.

24      This situation is not like that in Jones v. Jamrog, __ F.3d __, 2005 WL 1579729 (6th Cir.

25  2005).  There, the Sixth Circuit held that it was error to conclude that the defendant's request was

1    equivocal merely because it was contingent on whether the state's discovery policy would be

2    sustained.  The court emphasized that no weight should be given to the defendant's reason for wanting

3    to proceed pro se.  Id. at *5-6.  Here, in contrast, Stenson not only emphasized his desire for new

4    counsel, having taken steps to locate various attorneys, but he did not refute the trial judge's final

5    conclusion that he did not really want to represent himself, and he did not include such a request in his

6    final written request for new counsel (in fact he requested that Neupert be retained as counsel but that

7    Leatherman be replaced).  Federal courts must give significant deference to the trial court's factual

8    findings.  Stenson has failed in his habeas petition to rebut the trial judge's findings by clear and

9    convincing evidence.  The trial judge observed Stenson and engaged in numerous lengthy ex parte in

10   camera hearings.  In light of the record as a whole, this Court cannot conclude that the Washington

11   Supreme Court's holding was an objectively unreasonable application of federal law.[4]

12        Stenson argues in his reply that the Washington Supreme Court improperly made factual

13   findings on this issue, and therefore this Court owes no deference under § 2254(e).  This argument is

14   not persuasive.  The Washington Supreme Court did not make factual findings.  Rather, it reviewed

15   the trial judge's findings and analyzed whether they supported the judge's conclusion that the request

16   was equivocal.  The Court's concurrence with the trial judge's conclusion does not convert its

17   appellate analysis into a fact finding one.

18   II.  Claim B: Violation of Right to Counsel Due to Counsel's Conflict of Interest

19        In Stenson's first PRP, he argued that there was a conflict of interest due to differences in

20   strategic choices; specifically that Stenson wanted to pursue acquittal and counsel felt there was little

21   chance of acquittal and instead wanted to avoid the death penalty.  Citing Supreme Court and Ninth

22   Circuit case law, the Washington Supreme Court observed that the conflict of interest concept is

23

24        [4]  Additionally, it is worth nothing that Adams came out before Congress passed the AEDPA
     which the Supreme Court has interpreted as requiring more deference to state courts than was
     common before.  Arlt and Hernandez were both direct appeals of federal convictions, which do not

25   present the same comity and deference issues as habeas petitions of state court convictions.

1   usually applied to situations where the attorney is representing multiple co-defendants or when the

2   attorney is accused of crimes similar to those of the client and evidence could implicate the attorney.

3   The Washington Supreme Court concluded that even though Stenson cited conflict of interest cases in

4   his PRP, there really was no conflict of issue present in this case in the sense that the term is used in

5   the case law. <u>Stenson I</u>, 142 Wn.2d at 721-22. "Case law does not support the application of the

6   concept of conflict of interest to conflicts between an attorney and client over strategy." <u>Id.</u> at 722.

7   The Court then proceeded to analyze this claim under an "irreconcilable conflict" analysis (discussed

8   below). <u>Id.</u>

9        In light of the Washington Supreme Court's treatment of Stenson's conflict of interest claim,

10   the relevant inquiry here is whether that treatment was contrary to or an unreasonable application of

11   clearly established federal law.  Stenson first argues that the Supreme Court erroneously characterized

12   this disagreement as one over strategy rather than objectives.  Stenson then maintains that there is

13   clearly established federal law that applies the conflict of interest concept to a disagreement between

14   defendant and counsel over objectives but fails to cite any cases on point.  (Reply at 18-19).  At oral

15   argument Stenson's counsel characterized the conflict as one over "personal interests."  Stenson

16   maintains that Leatherman's loyalty was not to Stenson, but to Leatherman's own personal opposition

17   to the death penalty, which compelled him to do whatever was necessary to avoid the death penalty,

18   including disregarding Stenson's desire for an acquittal.  Counsel for the State countered that there is

19   no clearly established Supreme Court precedent treating this as a conflict of interest.

20        As the Washington Supreme Court correctly noted, a "conflict of interest" claim is usually

21   premised on the argument that defendant's counsel represents conflicting interests, such as

22   representing multiple co-defendants or when counsel is being prosecuted for related crimes.  <u>Wheat v.</u>

23   <u>United States</u>, 486 U.S. 153 (1988); <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980); <u>Holloway v. Arkansas</u>,

24   435 U.S. 475 (1978); <u>Mannhalt v. Reed</u>, 847 F.2d 576, 581 (9th Cir. 1988).  These cases do not

25   address conflicts arising from a disagreement between them over defense strategy or objectives or a

ORDER - 14

1   difference of "personal interests."  Accord United States v. Moore, 159 F.3d 1154, 1158 (9th Cir.

2   1998) (distinguishing a conflict of interest, which is "the existence of competing interests potentially

3   affecting counsel's capacity to give undivided loyalty to his client's interests," from an irreconcilable

4   conflict).  Regardless of whether the disagreement between Stenson and his counsel is characterized as

5   one over "strategy" or over "objectives," there is no clearly established federal law announced by the

6   United States Supreme Court that applies the conflict of interest analysis to such disagreements.

7   Likewise, there is no clearly established federal law treating a disagreement over personal beliefs as a

8   conflict of interest.  Therefore, the Washington Supreme Court's ruling was not contrary to or an

9   unreasonable application of clearly established federal law.

10  III.  Claim C: Violation of Right to Counsel Due to Irreconcilable Conflict

11          Forcing a defendant to go to trial with the assistance of an attorney with whom the defendant

12  has an irreconcilable conflict amounts to a constructive denial of the right to counsel in violation of the

13  Sixth Amendment. Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970), cited in Schell v. Witek,

14  218 F.3d 1017, 1025 (9th Cir. 2000).  When an irreconcilable conflict causes a complete breakdown

15  of the attorney-client relationship, the defendant need not show prejudice.  United States v. Moore,

16  159 F.3d 1154, 1158 (9th Cir. 1998) (citing Frazer v. United States, 18 F.3d 778, 785 (9th Cir.

17  1994)).

18          Not every conflict, however, amounts to a constructive denial of the right to counsel in

19  violation of the Sixth Amendment.  The Sixth Amendment does not guarantee a "meaningful

20  relationship" between a client and his attorney.  Morris v. Slappy, 461 U.S. 1, 14 (1983).  A

21  disagreement over decisions that are committed to the judgment of the attorney, such as strategic or

22  tactical decisions, does not implicate the Sixth Amendment.  Schell, 218 F.3d at 1026.  In contrast, a

23  complete breakdown in communication between the attorney and his client might amount to a

24  constructive denial of the right to counsel in violation of the Sixth Amendment if it prevents effective

25  assistance of counsel.  Id.  In assessing an irreconcilable conflict claim, the relevant factors are: 1) the

1    extent of the conflict, 2) the adequacy of the inquiry by the trial court, and 3) the timeliness of the

2    motion. Moore, 159 F.3d at 1158-59.

3         In Moore, the Ninth Circuit held that there was an irreconcilable conflict between the

4    defendant and his attorney and reversed the district court's denial of the motion for substitute counsel.

5    The extent of the conflict was profound.  The attorney failed to keep the defendant informed of the

6    status of the plea bargaining negotiations.  According to the defendant, he had no communication at all

7    with his attorney.  The attorney did not investigate or adequately prepare for trial.  In the 68 days

8    leading up to trial, the attorney interviewed only one witness.  The attorney indicated that he felt

9    physically threatened by the defendant.  The defendant threatened to sue the attorney for malpractice.

10   Id. at 1159.

11        In both Frazer and Schell, the Ninth Circuit held that the defendant had alleged sufficient facts

12   of an irreconcilable conflict to warrant an evidentiary hearing.  In Frazer, the defendant's attorney had

13   called the defendant derogatory racists names, threatened to provide ineffective counsel if the

14   defendant insisted on going to trial, and refused to collect useful evidence for mitigation of the

15   defendant's sentence.  18 F.3d at 780.  The court found that the attorney's statements, if true, would

16   be tantamount to a total lack of communication.  Id. at 783.  In Schell, the defendant alleged that his

17   attorney initially refused to "waste money" on a fingerprint expert, even though fingerprint evidence

18   was the only evidence that linked the defendant to the crime, and told the defendant that he should not

19   waste the court's time or money on a trial and should accept a plea.  Even after the attorney hired an

20   expert, she did not share the expert's report with the defendant despite his repeated requests to see it.

21   218 F.3d at 1026-27.  The state court completely failed to inquire into the conflict despite defendant

22   bringing it to the court's attention.  The Ninth Circuit remanded for an evidentiary hearing because the

23   record did not reflect how significantly the attorney-client relationship had deteriorated or whether the

24   defendant had himself sabotaged the relationship.  Id. at 1027.

25

ORDER - 16

1        The Washington Supreme Court rejected Stenson's irreconcilable conflict claim in his first

2   PRP.  Stenson I, 142 Wn.2d at 721-36.  Citing Moore, Brown, and Frazer, the Supreme Court

3   analyzed the extent of the conflict here, the adequacy of the judge's inquiry, and the timeliness of the

4   motion.  Reciting the facts outlined above, plus additional facts regarding the frequency of

5   communication between Leatherman and Stenson and Neupert and Stenson as well as the numerous

6   pre-trial motions that counsel had filed, the Supreme Court held that the breakdown in communication

7   was not so severe as to amount to a total lack of communication and a constructive denial of counsel.

8   Id. at 729-30.  "[T]he effects of any breakdown in communication on attorney performance seem

9   negligible."  Id. at 729.  The Supreme Court noted that counsel cross-examined 25 of the state's 33

10  witnesses, called five witnesses of its own, and that Stenson had "expressed general satisfaction with

11  the way his attorneys conducted the trial."  Id. at 730.  Unlike in Brown, where counsel's

12  representation was only "perfunctory," or in Moore, where counsel conducted only one interview in

13  the 68 days leading up to trial, the Supreme Court concluded that the representation Stenson received

14  "was far superior ...."  Id. at 730.

15       Stenson maintains that the Supreme Court's ruling on the extent of the conflict, the adequacy

16  of the inquiry, and the judge's finding regarding untimeliness was objectively unreasonable and

17  factually unsupported.  First, he argues that there was a complete breakdown of communication as of

18  August 3, that he and Leatherman never resumed communication after that date, and that Neupert's

19  communication with Stenson did not solve the lack of communication with Leatherman because "the

20  buck stopped" with Leatherman.  Stenson's argument is not persuasive.  Even though Leatherman was

21  lead counsel and made most of the decisions, Neupert functioned as a means of communication

22  between Stenson and Leatherman.  There is no indication in the record of any problems between

23  Stenson and Neupert or that Neupert did not relay the substance of his communications with Stenson

24  to his co-counsel Leatherman.  Nor has Stenson alleged such problems.  The fact that Neupert agreed

25  with Leatherman's assessment of the evidence and the unlikelihood of acquittal does not support

1   Stenson's claim because, regardless of Neupert's position, Stenson and Neupert maintained

2   communication.  While Leatherman may not have done what Stenson wanted, there was not a total

3   lack of communication.

4        Second, Stenson argues that the Washington Supreme Court's reliance on Stenson's failure to

5   request for new counsel after the August 3 hearing "lack[ed] a factual predicate" because the Supreme

6   Court failed to take account of the fact that it was Leatherman who moved to withdraw, not Stenson,

7   and that Leatherman acknowledged the lack of communication.  However, the fact that Stenson did

8   not bring a motion once communication had supposedly ceased by August 3 actually supports the

9   Supreme Court's conclusion that there was not evidence of a total breakdown of communication

10   permeating the entire trial.

11        Third, Stenson takes issue with the Supreme Court's reliance on Leatherman's competence as

12   a reason not to substitute counsel.  This argument is tied to his argument that the trial court did not

13   conduct an adequate inquiry.  Stenson argues that the trial judge did not conduct an adequate inquiry

14   but instead "contented himself with an endorsement of trial counsel's competency."  (Pet. at 37).

15   Some Ninth Circuit cases have held that a complete breakdown of communication amounting to a

16   constructive denial of the right to counsel may exist even if counsel's performance is competent.

17   United States v. Nguyen, 262 F.3d 998, 1003 (9th Cir. 2001); United States v. Adelzo-Gonzalez, 268

18   F.3d 772, 778 (9th Cir. 2001); United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000); United

19   States v. D'Amore, 56 F.3d 1202, 1206 (9th Cir. 1995), overruled on other grounds United States v.

20   Garrett, 179 F.3d 973 (9th Cir. 2000).  However, Moore and Frazer, both Ninth Circuit cases,

21   assessed the extent of the conflict by examining the attorney's performance and competence.  Stenson

22   has not cited any Supreme Court precedent in support of this particular argument.  Therefore, there is

23   no clearly established federal law announced by the Supreme Court that analyzing the extent of the

24   conflict by examining the attorney's performance and competence is objectively unreasonable.

25        As to the adequacy of the trial court's inquiry, it must "provide sufficient basis for reaching an

1    informed decision." Adelzo-Gonzalez, 268 F.3d at 777 (internal quotation and citation omitted).  In

2    Adelzo-Gonzalez, the Ninth Circuit held that the district court's inquiry was inadequate because the

3    court asked only open-ended questions. Id. at 777-78.  "While open-ended questions are not always

4    inadequate, in most circumstances a court can only ascertain the extent of the breakdown in

5    communication by asking specific and targeted questions." Id. at 777-78; see Nguyen, 262 F.3d at

6    1004 (presented with similar facts and even less inquiry by the district court judge, the Ninth Circuit

7    held that the district court abused its discretion because its inquiry was inadequate; "the trial court

8    should question the attorney or defendant privately and in depth and examine available witnesses")

9    (internal quotation and citations omitted).  However, in Hudson v. Rushen, 686 F.2d 826 (9th Cir.

10    1982), the Ninth Circuit held that the state trial judge's inquiry was adequate.  After hearing

11    defendant's explanation that his attorney was not introducing exculpatory evidence, and without

12    asking any questions, the judge denied the defendant's motion for new counsel.  In holding that the

13    judge's inquiry was adequate, the Ninth Circuit commented:

> it is true that the state trial court could have asked the defendant a series of pointed
> questions that inevitably would have resembled cross-examination regarding the
> validity of his defense.  However, we are convinced after reading the transcript of the
> state trial that the trial court knew what the defendant's defense was, that the trial
> counsel had consulted sufficiently with the defendant, that the trial counsel was
> prepared, and that his advice to the defendant to testify was not aberrational.

Id. at 831.

14
15
16
17
18
19    Unlike Schell and Musa where the trial court had made no inquiry and the evidentiary hearing

20    was the only way to assess the extent of the conflict, the trial court here held numerous ex parte

21    hearings with Stenson and Leatherman on this topic.  At oral argument before this Court, Stenson's

22    counsel made clear that Stenson does not seek an evidentiary hearing.  Rather than alleging facts not

23    yet in the record, Stenson argues generally that the trial judge's inquiry was inadequate and relied

24    inappropriately on the competency of Leatherman's representation.  He does not, however, point to

25    any additional inquiry that the trial court should have made, such as witnesses that should have been

ORDER - 19

examined or specific lines of inquiry that should have been explored. The transcript shows that the parties discussed at length the nature of the disagreement between them and that the judge listened and asked a few clarification questions. The trial court's inquiry does not appear to have been perfunctory or inadequate. Based on the record as a whole, this Court cannot conclude that the Washington Supreme Court's ruling on this issue was objectively unreasonable.

IV. Claim D: Violation Right to Counsel Due to Lack of Representation at Critical Stage in the Proceedings

A defendant has a right to counsel at every critical stage in the proceedings against him. United States v. Wadsworth, 830 F.2d 1500, 1510 (9th Cir. 1987) (citing Coleman v. Alabama, 399 U.S. 1 (1970)). A critical stage is any proceeding that implicates "substantial rights of the accused." Menefield v. Borg, 881 F.2d 696, 698 (9th Cir. 1989). In the context of a motion to substitute counsel, separate counsel is warranted for purposes of that motion when the current counsel fails to assist the defendant in making the motion, or either explicitly opposes the motion or takes an adversary and antagonistic stance regarding the motion. United States v. Adelzo-Gonzalez, 268 F.3d 772, 779-80 (9th Cir. 2001); Wadsworth, 830 F.2d at 1510-11. By taking such a position, counsel leaves the defendant effectively unrepresented at a hearing on the motion. Adelzo-Gonzalez, 268 F.3d at 779-80. In contrast, appointment of separate counsel to represent the defendant in a motion for new counsel is not required where defendant's current counsel does not oppose the request. LaGrand v. Stewart, 133 F.3d 1253, 1277 (9th Cir. 1998).

Stenson argued in his first PRP that Leatherman's antagonistic position towards his motion for substitute counsel effectively left him without representation during the hearing on his motion, which violated his right to counsel at every critical stage in the proceedings. The Washington Supreme Court rejected Stenson's claim. Stenson I, 142 Wn. 2d at 737-39. The Court held that Wadsworth, the key case on this issue, was distinguishable on the facts.

In <u>Wadsworth</u>, the defendant moved to dismiss his appointed counsel the day before trial on the grounds that his counsel had not adequately prepared for trial. In a hearing, the trial judge repeatedly asked the defendant what he felt was inadequate about his counsel, to which the defendant responded that counsel had not asked him what his position on the charges were or what had happened. His counsel countered that they had discussed these things and that defendant's allegations were "a bunch of hooey." 830 F.2d at 1507. Counsel stated that he had advised his client that he would not raise the particular defense theory that defendant wanted to assert because he did not believe that it was in his client's best interest, but that it was a defensible case on other grounds. Nonetheless, counsel admitted that he had stopped preparing for trial and had effectively quit when the defendant allegedly refused to cooperate. He had even scheduled another client's trial for the same day as the defendant's. The district court granted the motion and allowed the defendant to proceed pro se, but refused to appoint new counsel. <u>Id.</u> at 1507-10.

The Ninth Circuit held that the defendant was denied his right to counsel at the hearing on his motion because his attorney "had taken an adversary and antagonistic position on a matter concerning his client's right to counsel and to prepare for trial." <u>Id.</u> at 1510-11. The Ninth Circuit noted, however, that rather than ceasing to prepare for trial, counsel could have filed a motion to substitute counsel on his client's behalf so that the court could determine if the disagreement was over strategy or the theory of defense, in which case the court would have correctly denied the motion on the grounds that the attorney controls the strategy and theory of defense. <u>Id.</u> at 1509-10. Alternatively, counsel could have continued to prepare for trial on the defensible theory with the knowledge that if the defendant moved to substitute counsel, the court would deny it. <u>Id.</u> at 1510.

In <u>Stenson I</u>, the Washington Supreme Court recited the facts in <u>Wadsworth</u> and held that "[t]he Ninth Circuit outlined a scenario in <u>Wadsworth</u> in which reversal would not be required due to the absence of counsel during the substitution of counsel hearing; the facts of this case appear to fit that scenario." 142 Wn.2d at 739. The record showed that Leatherman continued to represent

1   Stenson vigorously, but that he and Stenson disagreed on the theory of defense regarding alternative

2   suspect evidence implicating Denise Hoerner.  When Stenson requested substitute counsel, the court

3   held a hearing and found that the dispute was over strategy, which did not warrant granting Stenson's

4   request.  The Supreme Court dismissed Stenson's claim that Leatherman was antagonistic to his

5   motion to substitute counsel because "Stenson was continuously represented by one cocounsel not in

6   an adversarial position to him [Neupert], and both counsel aided Stenson in preparing his motion for

7   substitution."  Id.

8           Stenson disputes the Supreme Court's conclusion that he was represented by cocounsel

9   Neupert during the hearing on his motion because "Neupert fully concurred in Leatherman's position."

10  (Pet. at 43).  Stenson points out that Leatherman stated during the hearing that Neupert shared his

11  opinion of the evidence and that Neupert did not advocate for Stenson to obtain new counsel.

12  Stenson likewise disputes the Supreme Court's conclusion that both counsel aided him in preparing his

13  motion for substitution because the record is clear that they were not acting as counsel when they did

14  so.  (Id.)  To support further his position that Leatherman was antagonistic to his motion, he contends

15  that Leatherman told the judge during the ex parte hearing that Stenson was guilty, was a liar, and was

16  brain-damaged, and that Leatherman revealed confidential information to oppose the motion (e.g. the

17  defense blood spatter expert's analysis and the results of Stenson's neuropsychological examination).

18  He argues that Leatherman's antagonism was much more extreme than in either Wadsworth or

19  Adelzo-Gonzalez, both of which required appointment of counsel for the hearing on a request for new

20  counsel.  In short, he disagrees with the Washington Supreme Court that Wadsworth is

21  distinguishable.

22          Habeas relief is not warranted on this claim because the Washington Supreme Court's holding

23  that Wadsworth is distinguishable was not objectively unreasonable.  Notably, both Wadsworth and

24  Adelzo-Gonzalez were direct appeals of federal court convictions, not habeas petitions of state court

25  convictions (plus, Wadsworth was pre-AEDPA and Adelzo-Gonzalez was handed down after the

1    Washington Supreme Court ruled in Stenson I).  Reasonable jurists could conclude that the facts here

2    are not as egregious as Wadsworth.  In Wadsworth, the fact that the attorney had stopped working to

3    prepare for trial was indicative of the attorney's failure to act in the best interests of his client and the

4    attorney's antagonistic stance towards the defendant's right to counsel.  Here, as the Washington

5    Supreme Court noted, the trial judge found that Leatherman was diligently representing Stenson's

6    interests, notwithstanding their differences of opinion as to strategy and theory of defense.

7         At oral argument on Stenson's habeas petition, his counsel suggested that Stenson lacked

8    diligent representation because of Leatherman's personal beliefs and attitudes towards Stenson, this

9    case, and the death penalty.  Diligent representation can only be measured by objective indications of

10    counsel's performance.  The Court can look only at what counsel does and cannot delve into counsel's

11    personal attitudes or personal feelings.  Counsel's personal beliefs or feelings has no place in this

12    analysis; they are no measure of effective assistance.

13    V.  Claim H: Violation of Right to Effective Assistance of Counsel at Trial

14         Stenson alleges that he received ineffective assistance of counsel because his counsel: 1) failed

15    to present alternate suspect evidence implicating Denise Hoerner, 2) failed to present exculpatory

16    evidence of the condition of Stenson's hands at the time of the murders, which Stenson maintains

17    could have rebutted the state's inculpatory evidence concerning the condition of his hands, 3) was not

18    prepared for testimony by Dr. Brady, the physician who performed the autopsy, that the shape of the

19    wounds on Frank Hoerner's head conformed to Stenson's missing nunchakus weapons, and 4) failed

20    to investigate and present evidence of the location of the missing nunchakus.

21         To succeed on an ineffective assistance of counsel claim, a petitioner must show 1) that his

22    counsel's performance fell below an objective standard of reasonableness, and 2) that his counsel's

23    deficient performance so prejudiced the petitioner that "there is a reasonable probability that, but for

24    counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v.

25    Washington, 466 U.S. 668, 694  (1984).  The objective standard of reasonableness is gauged at the

1    time of counsel's conduct.  Id. at 690.  Any review of counsel's performance must be "highly

2    deferential."  Id. at 689.  "[T]he relevant inquiry under Strickland is not what defense counsel could

3    have pursued, but rather whether the choices made by defense counsel were reasonable."  Siripongs v.

4    Calderon, 133 F.3d 732, 736 (9th Cir. 1998).

5           A.  Alternate Suspect Theory

6           In Stenson I, the Supreme Court began its analysis of the alternate suspect argument by citing

7    to its ruling in Stenson's direct appeal.  There, the Supreme Court had noted that Washington law on

8    admissibility of other suspect evidence requires that there be a train of facts or circumstances which

9    tend clearly to point to someone else.  The Supreme Court had concluded that even if Leatherman had

10   pursued Stenson's desired defense theory implicating Denise Hoerner as a suspect, there was nothing

11   in the record other than Stenson's unsubstantiated suspicions that pointed to anyone else as the

12   murderer.  Stenson Direct Appeal, 132 Wn.2d at 734-35.   In reviewing Stenson's first PRP, the Court

13   noted that Stenson relied on additional evidence in defense investigatory reports indicating that Denise

14   Hoerner made statements concerning killing her husband.  This evidence was not in the trial record

15   and the Supreme Court struck it.  Consequently, Stenson had no new evidence tending to show her

16   guilt.  Stenson I, 142 Wn.2d at 751.

17          The Supreme Court further held that even if these investigatory reports were part of the

18   record, there was still insufficient evidence that clearly pointed to Denise Hoerner to make any

19   evidence admissible.  "[T]he facts of the case make it difficult to meet the burden of coming up with

20   enough evidence to clearly point to Denise Hoerner as the guilty party."  Id. at 751.  The Supreme

21   Court noted that there was no evidence of anyone being at Stenson's residence the night of the

22   murders other than the two victims and Stenson.  Additionally, Leatherman did investigate the

23   possibility that Denise Hoerner committed the crimes by having an investigator stake out her house

24   and look into a possible boyfriend.  Leatherman also subpoenaed her bank records to see if there was

25   evidence of her hiring a hit man.  He found no evidence implicating Denise Hoerner.  Id. at 751-52.

1    In his habeas petition, Stenson argues that Leatherman's failure to investigate and utilize

2   evidence implicating Denise Hoerner constitutes ineffective assistance.  It appears that there are two

3   parts of this argument: one, that Leatherman was ineffective because he failed to investigate Denise

4   Hoerner sufficiently, and two, that Leatherman was ineffective because he failed to introduce evidence

5   implicating Denise Hoerner which he had possession of at the time and failed to cross-examine her in a

6   way that would implicate her.

7    In the context of an ineffective assistance of counsel claim, an attorney's investigation or lack

8   of investigation is judged for reasonableness.  "[C]ounsel has a duty to make reasonable investigations

9   or to make a reasonable decision that makes particular investigations unnecessary. In any

10  ineffectiveness case, a particular decision not to investigate must be directly assessed for

11  reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

12  judgments."  Strickland, 466 U.S. at 691.  "In assessing the reasonableness of an attorney's

13  investigation, however, a court must consider not only the quantum of evidence already known to

14  counsel, but also whether the known evidence would lead a reasonable attorney to investigate

15  further."  Wiggins v. Smith, 539 U.S. 510, 527 (2003).  If the decision not to investigate beyond a

16  certain point is reasonable, then the failure to do so cannot constitute ineffective assistance of counsel.

17    Here, the record does not show that Leatherman's investigation or decision not to pursue

18  further investigation was objectively unreasonable.  His initial investigation of Denise Hoerner as a

19  possible suspect did not reveal any evidence implicating her.  The only additional evidence that

20  Stenson argues Leatherman should have discovered and introduced is evidence relating to a lawsuit

21  that Frank Hoerner's life insurance company, Farmers New World Life Insurance Company

22  ("FNWL"), filed against Denise Hoerner before Stenson's trial in which FNWL sought declaratory

23  judgment that it need not pay benefits due to her refusal to cooperate.[5]  Apparently, Denise Hoerner

24

25    [5] This evidence is the subject of Stenson's pending Motion to Take Judicial Notice.  As
    discussed below, the Court grants the motion and takes judicial notice of these court documents.

ORDER - 25

refused to sign a claim form, give a statement, and give FNWL access to Frank Hoerner's medical records and health care providers. This evidence, however, is of marginal relevance and probative value to show that Ms. Hoerner committed these murders. Under Stickland's standard, which requires a "heavy measure of deference to counsel's judgment," Leatherman's decision not to investigate further was reasonable in light of all the circumstances.

Stenson also argues that Leatherman's failure to use this evidence at trial to implicate Denise Hoerner amounts to ineffective assistance of counsel. Leatherman did not pursue this strategy at trial because he concluded that it would alienate the jury and likely be inadmissible in any event. An attorney's reasonable tactical decision not to use certain evidence at trial is immune from attack. Gerlaugh v. Stewart, 129 F.3d 1027, 1033 (9th Cir. 1997). "[A] defense attorney's sense of the jury's reaction to testimony or evidence is a sound basis on which to make strategic decisions." Spaziano v. Singletary, 36 F.3d 1028, 1040 (11th Cir. 1994). Therefore, Leatherman's strategic choice not to attack the widow of one of the victims as a potential suspect because it would likely alienate the jury was a reasonable one that is immune from attack.

Stenson argues unpersuasively that Leatherman had a decent change of getting this evidence admitted. It is not ineffective assistance for an attorney to choose not to bring an evidentiary motion when he has a well-founded opinion that he would lose. Lowry v. Lewis, 21 F.3d 344 (9th Cir. 1994). To do otherwise would not only waste the attorney's time, but would sacrifice the attorney's credibility with the judge. Id. at 346. In a somewhat analogous case, a defendant challenged his Washington state court conviction on the ground that his counsel was ineffective for failing to investigate and introduce alternate suspect evidence. Jones v. Wood, 207 F.3d 557 (9th Cir. 2000). The Ninth Circuit rejected the state's argument that this evidence would not have been admissible. While noting the standard for admissibility of other suspect evidence under Washington law, the court found that there is a lower foundational requirement when the prosecution's case is largely circumstantial. In such situations, the defendant need only present evidence "of the same character"

1  that would implicate another person.  Id. at 562-63.  While the case against Stenson was

2  circumstantial, the Supreme Court's holding in Stenson I directly refutes any argument based on Jones

3  that Leatherman could have gotten such evidence admitted.  The Washington Supreme Court

4  reviewed all the evidence Leatherman had in his possession and concluded that it was not enough.

5  The Washington Supreme Court has the final word on the admissibility of evidence under state law.

6  To hold otherwise would fly in the face of the deferential standard required by the AEDPA.  In sum,

7  the combination of the likely inadmissibility of such evidence together with the possible negative effect

8  on the jury makes Leatherman's strategic decision not to pursue this particular defense theory a

9  reasonable one.

10      B.  "Hands" Evidence

11      To there is nothing in the record to support Stenson's argument regarding the medical

12  condition affecting his hands and Stenson abandons it in his Reply.

13      C.  Dr. Brady's Testimony

14      The Washington Supreme Court rejected Stenson's argument that Leatherman's failure to

15  personally interview and prepare for Dr. Brady's testimony was ineffective assistance of counsel.

16  Stenson I, 142 Wn.2d at 754-55.  Leatherman had sent his investigator to interview Dr. Brady, the

17  medical examiner.  At the time, Dr. Brady said that he could not tell that the wounds on Frank

18  Hoerner's head were caused by nunchakus.  At trial, however, he testified that the wound was caused

19  by nunchakus.  This was important because Stenson collected nunchakus, was an expert in their use,

20  and one set in his collection was missing at the time of the murder (there was an empty peg on the wall

21  where the rest of the collection hung).  Dr. Brady's change of testimony was apparently due to his

22  having seen photos of nunchakus after Leatherman's investigator interviewed him and his conclusion

23  based on these photos that they lined up with the wounds on the head.  The Supreme Court concluded

24  that it was not ineffective assistance of counsel when Leatherman did not personally interview Dr.

25

1    Brady and did not have his investigator bring photos for Dr. Brady to look at when he interviewed him

2    since Dr. Brady had examined nunchakus at the murder scene. Id. at 754-55.

3           In his habeas petition, Stenson maintains that the attorney's decision not to use such evidence

4    receives no deference when he completely fails to investigate. The record does not support the

5    premise of Stenson's argument. Leatherman did investigate what information Dr. Brady knew by

6    sending his investigator to interview Dr. Brady. There is no case law that requires the attorney

7    himself, rather than his assistant, interview all witnesses. Such a proposition is plainly untenable. See

8    LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998). Stenson has not shown that the

9    Washington Supreme Court's holding on this issue was contrary to or an unreasonable application of

10   clearly established federal law.

11          D.  Evidence Regarding Missing Nunchukas

12          The Washington Supreme Court also rejected Stenson's argument that Leatherman's failure to

13   investigate and present evidence of the location of the missing nunchakus was ineffective assistance of

14   counsel because the evidence showed only that Stenson had given away a pair of nunchakus as a gift

15   more than two years before the murders. Stenson I, 142 Wn.2d at 755-57. Stenson makes this same

16   argument in his habeas petition but does not indicate where this evidence exists in the record. In any

17   event, there is no basis for arguing that the Supreme Court's conclusion on this claim was contrary to

18   or an unreasonable application of clearly established federal law on ineffective assistance of counsel.

19   VI.  Claim E: Violation of Right Against Self-incrimination at Sentencing

20          In his first PRP, Stenson argued that his Fifth Amendment right not to incriminate himself was

21   violated when Leatherman conceded Stenson's guilt during the penalty phase because Leatherman's

22   statement was an assertion that Stenson himself accepted the verdict. The Washington Supreme Court

23   rejected this argument on the grounds that the privilege against self-incrimination does not extend to

24   the penalty phase. Stenson I, 142 Wn.2d at 750.

25

ORDER - 28

In his habeas petition, Stenson argues and the State concedes that the Washington Supreme Court's statement of the law is contrary to clearly established federal law as announced by the United States Supreme Court.  The Fifth Amendment right not to testify against oneself applies to the penalty phase.  "Where the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony."  Mitchell v. United States, 526 U.S. 314, 326 (1999); Estelle v. Smith, 451 U.S. 454 (1981).

The question, therefore, is whether a defense attorney's statement during opening or closing argument implying the defendant's guilt constitutes a self-incriminating statement by the defendant in violation of the Fifth Amendment.  While some of the case law suggests that it might in limited circumstances, those circumstances are not present here.  In U.S. v. Bentson, 947 F.2d 1353 (9th Cir. 1991), the defendant's attorney admitted in closing argument that the defendant did not file tax returns for two years.  On direct appeal, the defendant argued there was insufficient evidence to support the conviction.  The Ninth Circuit rejected that argument because, in part, the attorney's statement was "a straightforward judicial admission, not merely a concession for the sake of argument."  As such, it was "a binding concession" of the adverse fact.  Id. at 1356.  In United States v. McKeon, 738 F.2d 26 (2d Cir. 1984), the defense attorney asserted certain facts in his opening argument.  There was a mistrial before a verdict was reached.  In the new trial, the defense attorney asserted facts inconsistent with his earlier assertions (he had discovered new evidence in the interim).  The Second Circuit held that the prosecution could introduce the attorney's original statements as an admission by the defendant.  Id. at 33.  The court cautioned, however, that not all argument statements are admissible as admissions. They are an admission only if:

> the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial.  Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted.  The inconsistency, moreover, should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial.  The [trial] court must further determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant.

> The formal relationship of the lawyer as agent and the client as principle will rarely suffice to show this . . . . Some participatory role of the client must be evident, either directly or inferentially such as when the argument is a direct assertion of a fact which in all probability had to have been confirmed by the defendant.

Id.; see U.S. v. Blood, 806 F.2d 1218, 1221 (4th Cir. 1986) (holding that a prosecutor's statement in opening argument was not an admission because it was not a clear and unambiguous admission of fact).

Stenson argues that Leatherman's concession of Stenson's guilt is a violation of his Fifth Amendment rights because if his conviction were overturned and Stenson were retried, Leatherman's statement could be used as evidence against Stenson in his second trial. However, as the Second Circuit's holding demonstrates, a statement made during argument must meet a high threshold to be admissible in a subsequent trial. Leatherman's statements in opening and closing do not meet this threshold. Furthermore, it is speculative that Stenson would ever obtain a new trial.

VII.  Claim F: Violation of Right to Effective Assistance of Counsel at Sentencing

Stenson claims that Leatherman's decision to admit guilt during the penalty phase without discussing this with Stenson and obtaining his consent was ineffective assistance of counsel. Specifically, he argues that 1) Leatherman's statements undermined Leatherman's credibility with the jury because he directly contradicted the position he argued in the guilt phase, which was that Stenson was not guilty, 2) Leatherman's statements cast Stenson in a negative light, 3) there was no strategic value in admitting guilt such as when the defense is arguing an insanity or state of mind defense, 4) the admission undermined any mitigating circumstance of residual doubt, and 5) the admission undercut Dr. Lezak's testimony.

An attorney's decision to concede guilt with the goal of avoiding the death penalty at sentencing is not necessarily an unreasonable tactical decision. Florida v. Nixon, 125 S. Ct. 551 (2004) (conceding guilt during the guilt phase); Anderson v. Calderon, 232 F.3d 1053 (9th Cir. 2000) (conceding guilt during the guilt phase), overruled on other grounds by Osband v. Woodford, 290

1   F.3d 1036 (9th Cir. 2002); Felker v. Thomas, 52 F.3d 907 (11th Cir. 1995) (conceding guilt during

2   the penalty phase).  When the evidence against the defendant in a capital case is overwhelming and

3   counsel concedes guilt in an effort to avoid the death penalty, "counsel cannot be deemed ineffective

4   for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless

5   charade.'" Nixon, 125 S. Ct. at 563 (citation omitted).  In Felker v. Thomas, 52 F.3d 907 (11th Cir.

6   1995), the Eleventh Circuit held that the defense attorney's decision to concede guilt during the

7   sentencing phase of a capital case, without the defendant's consent, was not ineffective assistance of

8   counsel.  The jury had already found the defendant guilty.  Consequently, "[i]t is entirely reasonable

9   for an attorney to conclude that there is little to be gained and much to be lost by 'fighting the

10   hypothetical' and pretending that his freshly convicted client is not guilty in the eyes of the sentencing

11   jury." Id. at 912.  The court recognized that, in some circumstances, an attorney may reasonably

12   decide not to admit guilt and instead pursue a residual doubt strategy at sentencing.  Id.  Both

13   strategies are reasonable depending on the circumstances, and the decision to pursue one over another

14   "is a strategic question left to counsel."  Id.

15        This case law undercuts Stenson's arguments.  Once the jury had found Stenson guilty,

16   Leatherman's decision to imply Stenson's guilt and ask the jury to sentence him to life in prison rather

17   than to death was a reasonable one under the circumstances.  While it may be reasonable to imagine

18   that the jury would react negatively to Leatherman and Stenson's change of position from not guilty to

19   admitting guilt, it is equally if not more reasonable to imagine that the jury would react positively

20   because it showed that Leatherman and Stenson respected and accepted the jury's findings, thereby

21   gaining credibility with the jury.  Leatherman's approach was not objectively unreasonable.  Under

22   Felker, Leatherman's decision to pursue the strategy he did rather than a residual doubt strategy was

23   reasonable.

24        Nixon's holding that a defense attorney may admit the defendant's guilt only after consulting

25   with the defendant and obtaining his consent is not necessarily applicable here.  In Nixon, the attorney

1    conceded guilt in the guilt phase.  Leatherman did not concede Stenson's guilt to the jury during the

2    guilt phase.  Nixon did not hold that the attorney must obtain the defendant's consent when conceding

3    guilt in the penalty phase.  Therefore, the fact that Leatherman arguably implied that Stenson was

4    guilty during the penalty phase despite not obtaining Stenson's consent does not render Leatherman's

5    performance ineffective.  There is no clearly established United States Supreme Court precedent that

6    this is necessarily ineffective.  As Felker discussed, attempting to maintain credibility with the jury is a

7    reasonable strategic decision.

8    VIII.  Claim G: Violation of Right to Present Mitigating Evidence at Sentencing

9         The following are facts specific to this claim.  At the beginning of the penalty phase,

10   Leatherman proposed an instruction outlining the factors that could be considered as mitigating

11   circumstances.  He proposed that the impact of Stenson's execution on his family, including his three

12   children and his father who was suffering from a heart condition, should be included as a mitigating

13   circumstance.  Leatherman specifically stated that he intended to ask different members of Stenson's

14   family what the effect of Stenson's execution would be on the family, particularly his three children.

15   (REC 7172).

16        The judge first ruled that Leatherman could not ask the witnesses what sentence they

17   preferred.  (REC 7175).  Later, Neupert asked for clarification on whether he could ask witnesses

18   about the impact that Stenson's execution would have on different family members.  (REC 7249).

19   The judge responded that counsel could "not have instructions given as to the impact upon members

20   of Mr. Stenson's family.  It appears to me that that would be crossing into an area which is not

21   permissible in terms of the limited definition of mitigating circumstances . . . ."  (REC 7250).  When

22   Neupert was questioning Stenson's sister, he asked her various questions about her and her children's

23   relationship with Stenson, her feelings about Stenson, and whether she would continue to maintain a

24   relationship with him (all of which she responded to positively).  (REC 7262-65).  Neupert then asked

25

1   her if she had an opinion as to what effect Stenson's execution would have on her family.  The

2   prosecutor objected and the judge sustained.  (REC 7265).

3          Later, Leatherman again argued that counsel should be able to ask witnesses about the effect

4   of Stenson's execution on the family.  (REC 7270).  The judge responded that such questions were

5   not relevant, which he "juxtaposed to the question of whether or not that family would be available as

6   resources for Mr. Stenson were he incarcerated, which is relevant, a distinction [which] is subtle but

7   significant."  (REC 7272).  The judge excluded proffered testimony from Stenson's wife's sister as to

8   her opinion of the likely effect of Stenson's execution on his children.  (REC 7313).

9          In his direct appeal, the Washington Supreme Court rejected Stenson's argument that the trial

10  court erred in excluding testimony concerning the impact of Stenson's execution on his family.

11  Stenson Direct Appeal, 132 Wn.2d at 746-53.  The Court reviewed the facts outlined above and noted

12  that Stenson had offered testimony from various family members and friends that they loved him, had a

13  close relationship with him and would continue to do so if he were incarcerated, as well as the

14  evidence prepared by Stenson's mitigation specialist consisting of a binder of photos of Stenson as a

15  child and an adult with his children.  Id. at 748.  The Court then noted that under United States

16  Supreme Court precedent (Lockett v. Ohio, 438 U.S. 586 (1978), Penry v. Lynaugh, 492 U.S. 302

17  (1989), and Eddings v. Oklahoma, 455 U.S. 104 (1982)), a defendant is entitled to introduce any

18  aspect of the defendant's character or record or any aspect of the offense as a mitigating circumstance.

19  Id. at 750.  However, it cited Lockett for the principle that "nothing limits the traditional authority of a

20  court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the

21  circumstances of his offense."  Id.  The Washington Supreme Court then reviewed decisions by the

22  California and New Jersey Supreme Courts that both held that a defendant is not entitled to introduce

23  execution impact testimony because it is not relevant to the defendant's character, prior record, or the

24  offense.  Id. at 752-53.  The Washington Supreme Court concluded that the evidence at issue here was

25  equally not relevant and therefore there was no error in excluding it, especially since the trial court

ORDER - 33

1  allowed Stenson to introduce evidence concerning his relationship with his family.  Id. at 753.

2

3      Stenson makes a slightly different argument in his habeas petition.  As an initial matter,

4  Stenson is correct that mitigating evidence need not be related to the offense.  The Washington

5  Supreme Court clearly recognized this as well in noting that a defendant is entitled to introduce any

6  aspect of the defendant's character or record.  The issue is whether testimony about the impact on

7  Stenson's family of his execution is relevant to show an aspect of the defendant's character.  Stenson

8  has not pointed to any federal case holding that a defendant is entitled to "execution impact testimony"

9  as a mitigating factor.  Neither Lockett, Penry, or Eddings stand for this principle.  Instead, to counter

10 the Washington Supreme Court's conclusion that such evidence is not relevant, Stenson maintains that

11 testimony showing that the children would be psychologically devastated by his execution would show

12 that they had a strong bond to their father and he to them, and therefore he was of good character.

13     This argument is not persuasive.  First, Leatherman never argued that he wanted to introduce

14 such evidence as a way to show anything about Stenson's character.  His argument focused very

15 clearly on the what he characterized repeatedly as evidence showing the significant negative impact

16 Stenson's execution would have on Stenson's children and father.  Second, the trial judge never

17 excluded testimony concerning the bond between Stenson and his children or other family members.

18 There is no instance in the record when Leatherman or Neupert attempted to introduce evidence of the

19 bond between Stenson and his children and the judge excluded it.

20     In his reply brief, Stenson advances a new variation on this argument.  He argues it was

21 constitutional error not to include a jury instruction that more clearly indicated that the defendant's

22 character could be considered a mitigating factor.  The mitigation related instructions referred only to

23 a "relevant fact about the defendant" that "suggests a reason for not imposing the death penalty" or

24 "that in fairness or in mercy may be considered as extenuating or reducing the degree of moral

25 culpability or which justifies a sentence of less than death . . . ."  (REC 7209-10, 7660).  This

ORDER - 34

1   argument is unpersuasive.  Leatherman never sought to have different language in the instructions to

2   make it more clear that Stenson's character could be a mitigating factor.  The judge excluded only

3   execution impact testimony based on the lack of relevancy of such evidence to Stenson's character.

4   IX.  Claim I: Constitutionally Inadequate Proportionality Review

5          Washington state law requires that the Washington Supreme Court review on direct appeal

6   death penalty cases to insure that the penalty imposed is proportionate to similar cases.  The Supreme

7   Court did so in Stenson's direct appeal, holding that Stenson's sentence was proportionate to other

8   similar cases.  Stenson Direct Appeal, 132 Wn.2d at 759.

9          In his third PRP, Stenson attacked the Supreme Court's proportionality review from a different

10  angle than in his direct appeal.  He maintained that the database of cases upon which the Supreme

11  Court relied in conducting its proportionality review was incomplete because it included only

12  aggravated murder cases where the death penalty was imposed, but did not include such cases were

13  the death penalty was not imposed or not sought.  In other words, the database was skewed in favor

14  of death.

15         The Supreme Court dismissed this PRP under the abuse of the writ doctrine.  Stenson III, 153

16  Wn.2d at 141.  Stenson had argued that the incomplete nature of the database and the cases not

17  included in the database were new evidence, making the abuse of the writ doctrine inapplicable.[6]  The

18  Supreme Court rejected that argument based on its construction of the state statute requiring

19  proportionality review of all capital sentences.  RCW 10.95.120 requires trial courts to submit reports

20  in all cases in which a person is convicted of aggravated first degree murder.  RCW 10.95.130(2)(b)

21  requires the Supreme Court to determine whether a death sentence "is excessive or disproportionate

22

23         [6]  He had also argued that 1) the state courts' failure to disclose the incomplete nature of the
    database constituted a Brady violation, 2) his appellate counsel's failure to discover the incomplete
24  nature of the database amounted to ineffective assistance of appellate counsel, and 3) the incomplete
    nature of the database and the fact that it was skewed in favor of death constituted a violation of equal
25  protection, and the Eighth Amendment bar on cruel and unusual punishment.  Id. at 144 n. 3.

ORDER - 35

1   to the penalty imposed in similar cases, considering both the crime and the defendant." The statute

2   defines "similar cases" as cases reported in the official reporter for Supreme Court and court of

3   appeals "in which the judge or jury considered the imposition of capital punishment regardless of

4   whether it was imposed or executed, and in cases in which reports have been filed with the supreme

5   court under RCW 10.95.120." RCW 10.95.130(b)(2). The Supreme Court held that, while the RCW

6   10.95.120 required trial courts to submit reports in all cases in which the defendant was convicted of

7   aggravated first degree murder, RCW 10.95.130 required the Supreme Court to review for

8   proportionality only those cases in which the judge or jury considered the death penalty and for which

9   the trial court had submitted a report. The Court held that the clear language of the statute did not

10   require the Court to review all aggravated murder cases as Stenson had contended. Id. at 149. As

11   such, the additional cases that had not been included in the database did not constitute "newly

12   discovered evidence," and therefore Stenson's proportionality claim was procedurally barred under the

13   abuse of the writ doctrine. Id. at 149-50.

14        Stenson raises these same substantive arguments in claim I of his habeas petition. He concedes

15   that proportionality review is not a constitutional requirement. Nonetheless, he contends that, because

16   Washington state requires it, its administration must comport with constitutional requirements.

17   Stenson argues that it does not; specifically he argues that 1) the state courts' failure to disclose the

18   incomplete nature of the database constitutes a Brady violation, 2) his appellate counsel's failure to

19   discover the incomplete nature of the database amounts to ineffective assistance of appellate counsel,

20   and 3) the incomplete nature of the database and the fact that it is skewed in favor of death constitutes

21   a  violation of due process, equal protection, and the Eighth Amendment.

22        There are various problems with this claim. First, it may be procedurally barred because

23   Stenson raised this claim in his Third PRP and the Supreme Court dismissed it on procedural grounds.

24   Second, there is no evidence in the record supporting the underlying factual premise of this claim;

25   namely, there is no evidence showing that the database of cases that the Supreme Court considered in

ORDER - 36

1    its proportionality review was incomplete.  The only evidence Stenson points to are citations of

2    aggravated murder cases for which he claims no reports were filed.  However, none of the cases cited

3    actually establish whether a report was filed or not.  He also points to newspaper articles.[7]  Even if the

4    Court were to expand the record to include the newspaper articles in Attachments A-C, none of these

5    actually establish that the database was incomplete.  When the Supreme Court in Stenson III rejected

6    Stenson's argument that the incomplete nature of the database was new evidence, it did so without

7    citing any actual evidence of the incomplete nature of the database but nonetheless acknowledged the

8    existence of additional reports from aggravated murder cases that were not included in the database.

9    Id. at 147-49.  In short, while both parties and the Washington Supreme Court seem to accept as true

10   the assertion that the database did not include all aggravated murder cases, Stenson has not provided

11   this Court with any actual evidence of this assertion.

12           Whether claim I is procedurally barred or not, § 2254(b)(2) permits the district court to deny

13   the claim on the merits.  Because the Washington Supreme Court seemed to acknowledge the

14   incomplete nature of the database, this Court will address and deny this claim on its merits even

15   though there is no evidence in the record to support Stenson's proportionality claim.

16           A.  Brady Violation & Ineffective Assistance of Appellate Counsel

17           Apart from the many questionable premises underlying Stenson's Brady and ineffective

18   assistance of appellate counsel claims arising out of the proportionality review, these claims fail on the

19   merits because Stenson cannot show prejudice.  To succeed on a Brady claim, the petitioner must

20   show that exculpatory evidence material to either guilt or punishment was not turned over to the

21   petitioner.  "[E]vidence is material if there is a reasonable probability that, had the evidence been

22   disclosed to the defense, the result of the proceeding would have been different."  Strickler v. Greene,

_____

24        [7]  These articles, which are Attachments A-C to Stenson's memorandum, are the subject of
     Stenson's pending motion to expand the record and the State's motion to strike.  As discussed below,
25   the Court will not expand the record to include these documents.

527 U.S. 263, 280 (1999) (internal quotes and citation omitted).  Similarly, to prevail on an ineffective

assistance of counsel claim, the petitioner must show not only that his counsel performed below an

objective standard of reasonableness, but also that his counsel's deficient performance so prejudiced

Stenson that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 694  (1984).

While neither test requires a showing that the result would necessarily have been different, they clearly

require a showing that the result would more likely than not have been different.  Stenson cannot make

this showing in light of the Washington Supreme Court's ruling in Stenson III.

Even if the Stenson had known, either through disclosure by the state court system or by his

appellate counsel's discovery, that the database that the Supreme Court reviewed for proportionality

did not include all aggravated first degree murder cases, Stenson cannot show that the incomplete

nature of the database would more likely than not have led the Washington Supreme Court to reach a

different conclusion on Stenson's proportionality review.  In Stenson III, the Supreme Court held that

the proportional review statute requires only that it consider the cases in which reports have been filed,

not that it consider all cases in which reports should have been filed.  The Supreme Court's

interpretation of this Washington state statute is beyond this Court's review.  As such, Stenson III

forecloses any possibility that evidence of the incomplete nature of the database more likely than not

would have resulted in the Supreme Court reaching a different outcome in reviewing the

proportionality of Stenson's penalty.

### B. Due Process, Equal Protection, and Cruel and/or Unusual Punishment

It is clearly established federal law that there is no constitutional right to a proportionality

review of a death sentence.  Pulley v. Harris, 465 U.S. 37, 43-44 (White, J. concurring).  Nonetheless,

when the state establishes by statute a particular procedure for imposing a penalty in a criminal case,

the defendant has a "substantial and legitimate expectation" that the state will deprive him of his liberty

1    only if it complies with those statutory procedural requirements.  Hicks v. Oklahoma, 447 U.S. 343,

2    346 (1980).

3        Relying on Hicks, Stenson argues that Washington's statutorily required proportionality review

4    is a farce because it is limited to cases in which the death penalty was imposed but excludes

5    aggravated murder cases in which it was not imposed or not sought.  According to Stenson, nothing in

6    the statute limits review to only cases where the death penalty was imposed.  Essentially, it seems that

7    Stenson disagrees with the Washington Supreme Court's interpretation of the state proportionality

8    review statute.

9        While there is no Ninth Circuit case directly on point, an Eighth Circuit case is.  Palmer v.

10   Clarke, 408 F.3d 423 (8th Cir. 2005).  In Palmer, the petitioner challenged the Nebraska Supreme

11   Court's interpretation of a Nebraska statute requiring proportionality review on nearly identical

12   grounds that Stenson challenges the Washington Supreme Court's interpretation of Washington's

13   statute.   The Nebraska Supreme Court interpreted its statute as requiring comparison with only cases

14   in which the death penalty was imposed, but not with all criminal homicides or first degree murders.

15   The district court held that this interpretation was wrong because it rendered proportionality review a

16   nullity and was therefore an arbitrary application of the state-created right guaranteeing

17   proportionality review in violation of due process requirements.  Palmer v. Clarke, 293 F. Supp. 2d

18   1011, 1041-42 (D. Neb. 2003).  The Eighth Circuit reversed the district court because "the

19   Constitution does not require a federal court to reexamine a state court's proportionality finding in

20   order to adjudge the manner in which the court conducted its review or whether the court

21   misinterpreted the state proportionality statute."  Palmer, 408 F.3d at 438 (internal quotation and

22   citation omitted).

23       This Court finds the Eighth Circuit's reasoning persuasive.  This Court cannot grant habeas

24   relief on the ground that the Washington Supreme Court erroneously interpreted Washington's

25   proportionality statute.  The nature of the proportionality review is matter of state law because it is a

1   state-created right.  There is no indication that the Washington Supreme Court undertook

2   proportionality review in this case in anything less than good faith.  <u>See</u> <u>LaGrand v. Stewart</u>, 133 F.3d

3   1253, 1263 (9th Cir. 1998) ("once the Arizona Supreme Court undertook its proportionality review in

4   good faith and found that [petitioner's] sentence was proportional to the sentences imposed in similar

5   cases, the Constitution does not require the federal habeas court to look behind that conclusion")

6   (internal quotation and citation omitted).  Therefore, Stenson's proportionality claim fails on its merits

7   and is properly denied under § 2254(b)(2).

8   <u>X.  The State's Motion to Strike and Stenson's Motion to Expand the Record</u>

9          The State moves to strike the declarations of John Strait and Monroe Freedman and

10   Attachments A-F.  Stenson moves to expand the record to include these declarations and attachments.

11   The Court GRANTS the State's motion and DENIES Stenson's motion.

12          Rule 7 of the Rules Governing Section 2254 Cases provides that a court may expand the

13   record without holding an evidentiary hearing.  However, the Ninth Circuit held in <u>Cooper-Smith v.</u>

14   <u>Palmateer</u>, 397 F.3d 1236 (9th Cir. 2005), that under the recent Supreme Court case of <u>Holland v.</u>

15   <u>Jackson</u>, 124 S. Ct. 2736 (2004), a petitioner "must comply with § 2254(e)(2) in order to expand the

16   record under Rule 7."  397 F.3d at 1241.  Under § 2254(e)(2), if a petitioner has failed to develop the

17   factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on

18   the claim unless the petitioner shows that the claim relies on a new and retroactive constitutional law

19   or "a factual predicate that could not have been previously discovered through the exercise of due

20   diligence, <u>and</u> ... the facts underlying the claim would be sufficient to establish by clear and convincing

21   evidence that but for constitutional error, no reasonable factfinder would have found the petitioner

22   guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).

23          <u>A.  Declarations of John Strait and Monroe Freedman</u>

24

25

1    The Washington Supreme Court struck Strait's declaration, (REC 10405), and Stenson never

2    presented Freedman's declaration to the Washington Supreme Court.  Stenson has not shown that he

3    meets the requirements in § 2254(e)(2) with respect to these declarations.

4    Further, this Court does not consider expert opinion regarding the legal standard of care based

5    on the facts of this case necessary to adjudicate any of Stenson's claims.  "Although the determination

6    of whether counsel has performed deficiently is a mixed question of law and fact . . . there is no

7    requirement that expert testimony of outside attorneys be used to determine the appropriate standard

8    of care."  LaGrand, 133 F.3d at 1270 n.8.  Thus, the use of such expert testimony is a discretionary

9    decision for the court.  See Ainsworth v. Calderon, 138 F.3d 787, 791 (9th Cir. 1998).

10    B.  Attachments A-F

11    Attachments A-C are newspaper articles concerning the death penalty in Washington state.

12    The articles in Attachments A and B are not dated and do not indicate which newspaper they are from.

13    Stenson asserts in his memorandum that they are from the Seattle Post-Intelligencer, August 7, 2001.

14    The article in Attachment C indicates that is from the Seattle-Post Intelligencer dated August 6, 2001.

15    These newspaper articles are submitted in support of  Stenson's proportionality claim (claim I).

16    Attachment E is a King County Superior Court report.  Although it is not entirely clear what the

17    report contains, as far as the Court can tell it has to do with Stenson's proportionality claim.  These

18    documents were not part of the record before the state court.  The State maintains and Stenson

19    concedes that these documents are hearsay.  The Court agrees and will not expand the record to

20    include these documents.

21    Attachment D is an October 16, 1998 declaration by Mike Grubb in an unrelated case.

22    Attachment F is a Washington Court of Appeals decision in State v. Dyer from 1997.  Both of these

23    attachments support one of Stenson's claims that he has since withdrawn.  Therefore, the question of

24    their inclusion in the record is moot.

25    XI.  Stenson's Motion re Need for Evidentiary Hearing and To Deem Alleged Facts Admitted

1    Stenson asserts that the State's Answer did not sufficiently deny the facts Stenson alleged in

2 his Petition and thereby admitted those facts.  Stenson further asserts that this makes an evidentiary

3 hearing unnecessary.  In the alternative, Stenson requests that the Court compel the State to submit an

4 Amended Answer identifying with specificity which factual allegations its admits and which it denies.

5 If the Court rejects both of these assertions, Stenson requests in the alternative that the Court grant

6 Stenson leave to conduct discovery, specifically to request admissions by the State.  As a separate

7 matter, Stenson explicitly requests an evidentiary hearing to support his argument that his trial counsel

8 failed to present evidence about Denise Hoerner as a potential suspect.

9    Based on Stenson's counsel's comments at oral argument, it is not clear if these issues are now

10 moot.  His counsel indicated that Stenson does not seek an evidentiary hearing.  Nor has he ever

11 pointed to any specific facts that he would seek to bring out in an evidentiary hearing.  Likewise, he

12 has never pointed to any actual dispute over facts that necessitates this particular motion.

13 Nonetheless, in an abundance of caution, this Court DENIES this motion on its merits.

14    A.  Factual Allegations Are Not Deemed Admitted

15    The State's Answer began with a "Statement of Material Facts" section in which the State

16 quoted the Washington Supreme Court's summarization of the facts surrounding Stenson's conviction

17 and sentence.  The State inserted a footnote in this section stating that "[u]nless specifically admitted

18 in this answer, the State denies the factual allegations contained in Stenson's habeas corpus petition

19 and supporting memorandum."  (Answer at 1-2 & n.2).

20    Stenson contends that this amounts to a failure to deny the alleged facts.  According to

21 Stenson, the State's Answer does not comply with Rule 5 of the Rules Governing Section 2254 Cases

22 in the United States District Court and that pursuant to Rule 8(d) of the Federal Rules of Civil

23 Procedure, facts are admitted when not denied in a responsive pleading.

24    This argument is without merit.  Rule 5 of the § 2254 Rules does not specifically require that

25 the State deny each factual allegation.  Rather, it merely requires that the answer "respond to the

ORDER - 42

1    allegations of the petition."  The Advisory Committee Notes comment that the Answer "serves several

2    important functions: it permits the court and the parties to uncover quickly the disputed issues; it may

3    reveal to the petitioner's attorney grounds for release that the petitioner did not know; and it may

4    demonstrate that the petitioner's claim is wholly without merit."  The Ninth Circuit has made clear that

5    "[n]either Rule 5, nor the Advisory Notes, nor subsequent case law set out any further restrictions on

6    the form of the answer, unlike Federal Rules of Civil Procedure 8(b) and 8(d), which require fact-by-

7    fact responses."  Williams v. Calderon, 52 F.3d 1465, 1483 (9th Cir. 1995).  The "important

8    functions" identified by the Advisory Committee Notes do not necessarily require fact-by-fact

9    responses.  While the State's footnote was non-specific as to which facts it denied, the State's failure

10   to deny each and every factual assertion cannot be said to be an admission.

11         B.  An Amended Answer Is Not Necessary

12         Because the Answer need not contain fact-by-fact denials or admissions under Rule 5 and there

13   is no other reason why the State's Answer is deficient, there is no basis to require the State to amend

14   its Answer.

15         C.  Discovery

16         Under Rule 6(a), a judge may, for good cause, authorize discovery under the Federal Rules of

17   Civil Procedure and may limit discovery.  The Rule requires that the requesting party provide reasons

18   for the request and include proposed requests for admission.  Good cause is shown "where specific

19   allegations before the court show reason to believe that the petitioner may, if the facts are fully

20   developed, be able to demonstrate that he is entitled to relief . . . ."  Bracy v. Gramley, 520 U.S. 899,

21   908-09 (1997) (quotations and citation omitted).  However, it was not meant to allow petitioner to

22   use discovery as a fishing expedition.  Calderon v. U.S. Dist. Court for the N.D. Cal. (Nicolaus), 98

23   F.3d 1102, 1106 (9th Cir. 1996).

24         Stenson has not shown good cause.  Given the fact that the State is not required by Rule 5 to

25   respond to each of Stenson's factual allegations, the State's failure to do so cannot provide the basis

1  for Stenson's good cause.  More importantly, Stenson makes only a conclusory request for discovery

2  but did not include proposed requests for admission.

3          D.  Evidentiary Hearing Regarding Denise Hoerner

4          Contrary to his counsel's more recent statement at oral argument, Stenson requested in this

5  motion an evidentiary hearing to determine what material was available to trial counsel regarding

6  Denise Hoerner.  Stenson has not shown that he is entitled to an evidentiary hearing.  He has not

7  pointed to any "factual predicate that could not have been previously discovered through the exercise

8  of due diligence" as required by § 2254(e)(2).

9  XI.  Stenson's Motion to Take Judicial Notice

10          Stenson requests that the Court either take judicial notice of or expand the record to include

11  evidence relating to a lawsuit that Frank Hoerner's life insurance company filed against Denise

12  Hoerner before Stenson's trial in which the company sought declaratory judgment that it need not pay

13  benefits due to her refusal to cooperate in signing a claim form, giving a statement, and refusing to

14  grant access to Frank Hoerner's medical records and health care providers.  Stenson moves in the

15  alternative to expand the record to include these court documents.  The documents that Stenson

16  moves to have included in the record are: 1) the complaint for declaratory judgment, 2) deposition

17  testimony of Denise Hoerner, 3) declaration of Shelly Navare, claim supervisor at the company, and 4)

18  opinion by Superior Court Judge George L. Wood that the company could not compel Ms. Hoerner to

19  provide the material demanded.  (Pet'r Mot. to Take Judicial Notice, Appendix A-D).  Stenson

20  contends that this evidence could have been used either to impeach Ms. Hoerner as a witness and/or to

21  present her as a potential alternative suspect.

22          Judicial notice is appropriate in this instance.  Fed. R. Evid. 201 governs when a court may

23  take judicial notice of adjudicative facts.  Under Rule 201(d), the court must take judicial notice if

24  requested by a party and supplied with the necessary information.  A court "may take notice of

25  proceedings in other courts, both within and without the federal judicial system, if those proceedings

ORDER - 44

have a direct relation to the matters at issue." <u>United States ex rel. Robinson Rancheria Citizens Council v. Reid</u>, 971 F.2d 244, 248 (9th Cir. 1992). Judicial notice is therefore appropriate here. These documents are relevant to Stenson's ineffective of assistance of counsel claim regarding alternate suspect evidence. The motion is GRANTED. Because the Court grants the request to take judicial notice, it need not reach Stenson's alternative request to expand the record to include these documents.

CONCLUSION

For the foregoing reasons the Court DENIES Stenson's Petition for Writ Habeas Corpus, the Court GRANTS the State's motion, DENIES Stenson's motions to expand the record and regarding an evidentiary hearing, and GRANTS Stenson's motion to take judicial notice.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: July 26, 2005

Marsha J. Pechman
United States District Court

ORDER - 45